### The INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Plaintiff,

v.

### Ron CAREY, William Hamilton, Jere Nash, the November Group, Inc., Martin Davis, the Share Group, Inc., Michael Ansara, Barbara Arnold, Citizen Action Management Fund, Ira Arlook, Charles Blitz, Rochelle Davis, Cohen, Weiss and Simon, and Nathaniel Charny, Defendants.

#### No. 00 CIV. 2952(LTS).

United States District Court, S.D. New York.

Oct. 1, 2001.

J. Bruce Maffeo, Esq., Walter A. Kretz, Esq., Seiff Kretz & Maffeo, New York City, for Plaintiff.

Robert J. Boyle, Esq., New York City, for Defendant William Hamilton.

Judith Brown Chomsky, Esq., Elkins Park, PA, for Defendant Ron Carey.

Mark J. MacDougall, Esq., Michael J. Mueller, Esq., Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, for Defendants Ira Arlook and Rochelle Davis.

David Ryan, Esq., Nixon Peabody LLP, Boston, MA, of Defendant Michael Ansara.

Thomas K. Birch, Esq., Scott P. Rogoff, Esq., Hamilton & Dahmen, LLP, Boston, MA, of Defendant the Share Group, Inc.

Sheryl E. Reich, Esq., Gerald B. Lefcourt, P.C., New York City, for Defendant Charles Blitz.

Mark Anesh, Esq., Steven Vervenoitis, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York City, for Defendant Nathaniel Charny.

Michael Keating, Esq., Foley, Hoag & Elliot LLP, Boston, MA, for Defendant Barbara Arnold.

John R. Wing, Esq., Linda Braun, Esq., Weil, Gotshal & Manges, LLP, New York City, for Defendant Martin Davis.

Charles D. Hellman, Esq., Housman & Hellman, Esq., New York City, for Defendant Cohen, Weiss and Simon LLP.

## *OPINION AND ORDER*

SWAIN, District Judge.

Plaintiff, the International Brotherhood of Teamsters ("IBT"), brings this action pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), alleging that Defendants defrauded the IBT of funds which were used improperly to promote Defendant Ron Carey's ("Carey") 1996 candidacy for re-election as the IBT's General President. In addition, the IBT asserts malpractice claims against De-

fendant Cohen, Weiss and Simon ("Cohen Weiss") and Defendant Nathaniel Charny ("Charny"). Defendants Carey and William Hamilton ("Hamilton") have moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the IBT's complaint. Defendants Martin Davis, Michael Ansara, Ira Arlook, Rochelle Davis, Charles Blitz, Cohen Weiss and Charny have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the IBT's complaint. Defendants the Share Group, Inc. and Barbara Arnold have moved pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss the complaint. In addition, Defendants Carey and Charles Blitz have moved for sanctions against Plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure.

For the reasons set forth below, the motions of Defendants Carey, Hamilton, Martin Davis, Michael Ansara, Barbara Arnold, Ira Arlook, Rochelle Davis, Charles Blitz and the Share Group, Inc. are granted insofar as they are brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motions of Defendants Carey and William Hamilton are denied insofar as they are brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. The Court declines to exercise supplemental jurisdiction over the state law claims against Defendants Cohen Weiss and Charny. Given that the Court's resolution of Barbara Arnold's and the Share Group, Inc.'s motions to dismiss of pursuant to Rule 12(b)(6) is dispositive, the Court will not address their arguments under Rule 9 of the Federal Rules of Civil Procedure. The motions of Defendants Carey and Charles Blitz for sanctions under Rule 11 of the Federal Rules of Civil Procedure are denied.

## BACKGROUND [1]

In 1988, the Government filed a civil RICO action against the IBT and its leadership. In connection with the 1988 lawsuit against the IBT the Government sought, among other relief, to establish Government supervision of the election of IBT officials. Complaint, ¶ 27. In March 1989, the Government and the IBT entered into a consent decree settling the Government's claims against IBT. The consent decree provided, among other things, for direct, secret ballot, elections of IBT officers and further provided that the Court would appoint an election officer (the "Election Officer") to supervise the election in 1991 for IBT national officers and, if the Government so requested, the 1996 election. *Id.* ¶ 28. The consent decree also authorized court-appointed officers to investigate and sanction IBT members and officers for violations of the IBT constitution and federal law. *Id.* Beginning in 1992, pursuant to the terms of the consent decree, a panel called the Independent Review Board ("IRB") assumed responsibility for determining whether members or officers had violated the IBT Constitution and federal law. *Id.*

The Government exercised its right to have the 1996 IBT election supervised pursuant to the consent decree. *Id.* ¶ 30. The court gave the Election Officer authority to supervise the 1996 election and approved rules governing the conduct of the 1996 election. The election rules prohibited the use of IBT funds to promote the candidacy of any individual and barred employers from contributing to the election campaign or soliciting contributions for any candidate. *Id.* ¶ 31.

Defendant Carey and James P. Hoffa campaigned in the 1996 election for IBT General President. Carey was declared the winner in a close and hotly contested election. *Id.* ¶¶ 32–33.

Subsequently, on August 21, 1997, the Election Officer invalidated the 1996 election on several grounds, one of which was that the Carey re-election campaign had engaged in improper fund-raising that involved the use of IBT funds to promote Carey's candidacy. The Election Officer ordered a rerun election. *Id.* ¶ 34. In July 1998, the IRB permanently barred Carey from IBT membership after finding that Carey had violated his fiduciary duties and knowingly derived personal benefit from improper election campaign contributions in connection with the 1996 election. *Id.* ¶ 35. The IRB also permanently barred Defendant Hamilton from holding any office or having any employment relationship with the IBT upon finding that Hamilton had embezzled IBT funds and had brought reproach on the IBT. *Id.* ¶ 36.

In connection with the 1996 election, Defendants devised a scheme to defraud the IBT by causing the IBT to contribute IBT funds to certain organizations in exchange for contributions to the Carey re-election campaign by certain individuals. *Id.* ¶ 40. In furtherance of this scheme, Jere Nash,[2] after consulting with Cohen Weiss, established a fund-raising committee, Teamsters for a Corruption Free Union ("TCFU"), to accept donations to the Carey campaign. *Id.* ¶ 42. TCFU established a separate bank account for deposit of donations to Carey's campaign. *Id.* ¶ 43. Defendants Martin Davis, Michael Ansara and Charles Blitz agreed to solicit donors for Carey's re-election campaign.

---

1. The following facts are taken from the complaint and Plaintiff's RICO statement, which are accepted as true for purposes of this motion.

2. The complaint was dismissed voluntarily as to Jere Nash on or about July 28, 2000.

*Id.* ¶ 44. The Defendants induced donors to make contributions by promising that the IBT would make contributions to certain political organizations designated by the donors in return for contributions to the campaign. *Id.* ¶ 45.

Michael Ansara and Martin Davis met in furtherance of the scheme and agreed that Charles Blitz would send the donors' checks to Michael Ansara, who would hold the checks pending confirmation that a reciprocal IBT contribution had been made. *Id.* ¶ 46. Michael Ansara agreed that, once the IBT approved the reciprocal contribution, he would forward the donors' check to the TCFU in New York. *Id.* ¶ 47. Martin Davis notified Jere Nash of the scheme, who in turn contacted Defendant Hamilton. Hamilton agreed to seek Carey's approval of the IBT donations to the political organizations selected by the donors. The IBT could not make the contributions without Carey's approval. *Id.* ¶¶ 48–51.

In or about October 1996, Charles Blitz asked Defendant Rochelle Davis, the Financial and Administrative Director of Defendant Citizen Action, a lobbying organization concerned with federal, state and local issues, to request a $225,000 contribution from the IBT. *Id.* ¶ 55. On or about October 14, 1996, Rochelle Davis directed a Citizen Action employee to send a written request for $225,000 to Hamilton with a copy to Michael Ansara. On or about October 23, 1996, Rochelle Davis, at Hamilton's direction, sent a request to Hamilton seeking a second contribution in the amount of $250,000. The total amount requested by Citizen Action was $475,000. *Id.* ¶¶ 56–57.

Martin Davis thereafter asked Jere Nash to ask Hamilton to recommend to Carey that the IBT make the contributions to Citizen Action. Nash met with Carey's executive secretary in mid-October 1996 in order to explain the scheme. Then, on or about October 16, 1996, Nash spoke with Carey by telephone and explained that the IBT contributions to Citizen Action would benefit Carey's re-election campaign. Carey told Nash that he would approve the contribution to Citizen Action. *Id.* ¶¶ 58–61. On or about October 23, 1996, Hamilton sent Carey a memo recommending approval of the Citizen Action contributions. On or about October 24, 1996, Carey approved the check request for Citizen Action. *Id.* ¶¶ 62–63. In or about October 1996, the IBT contributed $475,000 in IBT General Treasury funds to Citizen Action. *Id.* ¶ 64.

At the time Carey approved the IBT contributions to Citizen Action, Defendant Michael Ansara sent Defendant Charny, an attorney who was then associated with Defendant Cohen Weiss, the donor contributions to TCFU, which Charny deposited in TCFU's bank account in New York City. *Id.* ¶¶ 66–67. Cohen Weiss was responsible for determining whether the contributions to TCFU were permissible under federal law and the elections rules promulgated pursuant to the consent decree. *Id.* ¶ 68. Cohen Weiss assigned Charny, a junior associate, to interview contributors to the TCFU and determine whether the donors were allowed to make the contributions. Cohen Weiss failed, however, to conduct an adequate investigation to determine whether the contributions to TCFU complied with federal law and the election rules. *Id.* ¶¶ 69–70.

In or about October 1996, Nash asked Hamilton to recommend an IBT contribution to Project Vote, an organization whose goal was to mobilize low income and minority voters. On or about October 17, 1996, Hamilton sent a memo to Carey seeking approval of a $75,000 contribution to Project Vote. *Id.* ¶¶ 71–74. On or about October 17, 1996, Carey's executive secre-

tary telephoned Carey and Carey approved the request. Shortly thereafter, Hamilton caused the IBT to donate $75,000 to Project Vote. *Id.* ¶¶ 75–76. On or about October 23, 1996, Hamilton sent a second memo to Carey asking for another contribution of $100,000 for Project Vote. Carey's executive secretary contacted Carey by telephone and Carey approved the $100,000 check request for Project Vote. The IBT then donated $100,000 to Project Vote. *Id.* ¶¶ 77–79. Michael Ansara then mailed Charny the donor contributions to TCFU that Blitz had solicited in return for the IBT's Project Vote contribution and Charny deposited the funds in the TCFU account. *Id.* ¶¶ 81–82.

In or about October 1996, Martin Davis asked Nash to ask Hamilton to recommend an IBT contribution to National Council of Senior Citizens ("NCSC"), an organization that promoted the interests of senior citizens. *Id.* ¶¶ 84–85. On or about October 16, 1996, Hamilton sent Carey a memorandum recommending that the IBT contribute $85,000 to NCSC. Carey spoke with his secretary about the contribution on the telephone and approved the request. The IBT then contributed $85,000 to NCSC. *Id.* ¶¶ 87–89. NCSC then sent one half of the $85,000 amount to the November Group and TCFU. *Id.* ¶ 91.

Under the IBT election rules, employers were not eligible to contribute or solicit funds for any IBT candidate. *Id.* ¶ 92. Plaintiff alleges that Defendant Barbara Arnold, Michael Ansara's wife, violated the election rules by donating money to the Carey re-election campaign. *Id.* ¶¶ 93–94. Barbara Arnold was a director of Defendant the Share Group, a telemarketing firm that employed hundreds of people. *Id.* ¶ 94. Her contribution was solicited by Michael Ansara, also an employer. *Id.* In connection with Arnold's contribution,

Martin Davis and Ansara agreed to obtain funds from the IBT to reimburse Arnold. At the same at time, Charny advised Ansara that Arnold's contribution was acceptable. *Id.* ¶¶ 95–96.

On November 11, 1996, Ansara arranged for Arnold to contribute $45,000 to the TCFU. On December 4, 1996, Ansara arranged for Arnold to contribute an additional $50,000 to the TCFU. *Id.* ¶¶ 97, 99. In order to reimburse Arnold for the contribution, Martin Davis and Ansara caused Share Consulting, Ansara's consulting business, to submit a padded invoice to the IBT for a telephone "get out the vote" campaign. Arnold was reimbursed through the excess funds paid by the IBT for the inflated bill. *Id.* ¶ 102. In addition, Martin Davis and Ansara agreed that Share Consulting would submit a fraudulent invoice for $75,000 to Citizen Action for consulting work that had never been performed. *Id.* ¶ 103. Citizen Action paid the bill, which was used to reimburse Arnold for her contribution to Carey's re-election campaign. *Id.* ¶¶ 103–104.

In addition to the foregoing schemes, in or about October 1996, Martin Davis sought to obtain an additional $100,000 from the IBT to pay a Carey re-election campaign debt owed to the November Group, a Washington, D.C. based consulting group that performed direct mail campaigns.[3] *Id.* ¶ 105. Plaintiff alleges that Martin Davis first attempted to have the November Group debt paid by causing IBT to make another contribution to Citizen Action, which would then have paid the November Group. Martin Davis informed Defendant Ira Arlook, Executive Director of Citizen Action, that he would raise funds from the IBT for Citizen Action if Citizen Action would use $100,000 of those funds to pay the November Group. Arlook then

---

**3.** The complaint was dismissed voluntarily as to the November Group on July 24, 2000.

sent a memo to Hamilton requesting a $150,000 contribution from the IBT. *Id.* ¶¶ 106–107. Hamilton, however, believed that an additional contribution to Citizen Action could not be justified. *Id.* ¶ 108.

Hamilton and Martin Davis then agreed to disguise the Citizen Action contribution by arranging with an AFL–CIO official to have the IBT contribute $150,000 to the AFL–CIO, which would then contribute $150,000 to Citizen Action. At Martin Davis' request, Nash asked Hamilton to recommend a $150,000 contribution from the IBT to the AFL–CIO. *Id.* ¶¶ 108–110. On or about October 31, 1996, Hamilton sent Carey a memo recommending that the IBT contribute $150,000 to the AFL–CIO. Shortly thereafter, Carey spoke with his executive secretary by telephone and approved the AFL–CIO contribution. *Id.* ¶¶ 112–113. In or about November 1996, the IBT contributed $150,000 in IBT funds to the AFL–CIO; the AFL–CIO then sent $150,000 to Citizen Action, which used the funds to pay the expenses of the Carey re-election campaign. *Id.* ¶¶ 115–117.

In 1997, the Election Officer began investigating whether contributions to TCFU had violated the election rules. *Id.* ¶ 118. Charny attempted to cover up Defendants' actions in connection with the contributions. Plaintiff alleges that, during a telephone interview with the Election Officer, Arnold, with Charny present, stated falsely that no one had solicited her contributions. Charny did not inform the Election Officer that Arnold's statement was false and that he had spoken with Ansara about Arnold's contributions in October 1996. On or about February 20, 1997, Charny stated in an affidavit submitted to the Election Officer that he had spoken personally with each of the TCFU contributors in order to determine whether the contributions complied with federal law

and the election rules. In addition, Cohen Weiss submitted a position paper, which Charny helped prepare, that falsely stated that Charny had spoken with each of the donors to TCFU to determine whether their contributions complied with the election rules and federal law and that Cohen Weiss had fully investigated the Arnold contribution. *Id.* ¶¶ 120–125. On or about March 19, 1997, Cohen Weiss submitted a revised position paper that purported to correct statements in the first paper. The second position paper also falsely stated that Charny had personally interviewed each of the TCFU contributors. *Id.* ¶¶ 126–127.

Upon conclusion of the Election Officer's investigation concerning the Carey re-election campaign's fund-raising, the Election Officer imposed sanctions against certain of the Defendants. Jere Nash, Martin Davis, Michael Ansara, the November Group and the Share Group, Inc. were barred from performing any work for the IBT or its affiliates. *Id.* ¶ 129. Citizen Action was barred from obtaining or attempting to obtain contributions from the IBT or its affiliates. *Id.* ¶ 130. Charny was barred from any further participation in the 1996 IBT election. *Id.* ¶ 134. On July 27, 1998, the IRB permanently barred Carey from IBT membership and from holding any office or having any employment relationship with the IBT. *Id.* ¶ 135. The complaint asserts that the IRB found that Carey had violated his fiduciary duties to the IBT and had knowingly derived a personal benefit from the improper election campaign contributions. *Id.*

In 1998, a rerun election was held and James Hoffa was elected IBT General President. The IBT expended at least 2.2 million dollars in connection with the supervision of the 1998 rerun election. *Id.* ¶ 37.

Hamilton, Jere Nash, Martin Davis, Michael Ansara, Charles Blitz and Charny were subsequently prosecuted on federal criminal charges. Jere Nash, Martin Davis, Michael Ansara Charny and Charles Blitz pled guilty to some or all of the criminal charges, including mail fraud and embezzlement of IBT funds. *Id.* ¶¶ 137–138. Following a jury trial, Hamilton was convicted of conspiracy, embezzlement, mail fraud, wire fraud, making false statements to the Election Officer and perjury. *Id.* ¶ 139.

### DISCUSSION

*Rule 12(b)(1)*

Defendants Carey and Hamilton move to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6). Generally, courts determine a motion to dismiss under Rule 12(b)(1) before ruling on a Rule 12(b)(6) motion to dismiss because dismissal of an action for lack of subject matter jurisdiction will render all other defenses and motions moot. *See United States, ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1155–56 (2d Cir.), *cert. denied, Kreindler & Kreindler v. United Technologies Corp.*, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *see also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir.1990).

■ However, "in cases where the asserted basis for subject matter jurisdiction is also an element of the plaintiff's allegedly federal cause of action, [the court will] ask only whether—on its face—the complaint is drawn so as to seek recovery under federal law ... If so, then we assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1189 (2d Cir.1996) (citing *Spencer v.*

*Casavilla*, 903 F.2d 171, 173 (2d Cir.1990)). Accordingly, "when the contested basis of jurisdiction is also an element of the plaintiff's federal claim, the claim should not be dismissed for lack of subject matter jurisdiction." *Rivanna Trawlers Unlimited v. Thompson Trawlers*, 840 F.2d 236, 239 (4th Cir.1988) (citing *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

■ A plaintiff asserting a civil claim under RICO has standing if the plaintiff demonstrates "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir.), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990)). Because subject matter jurisdiction in this action is invoked by alleging an adequate federal claim under RICO, the Court "must entertain the suit unless the [RICO] claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'" *Spencer v. Casavilla*, 903 F.2d at 173 (citing *Bell v. Hood*, 327 U.S. at 682, 66 S.Ct. 773). Plaintiff's complaint alleges a RICO violation that is neither immaterial nor insubstantial and does not appear to have been made solely for the purpose of obtaining federal jurisdiction. Thus, "'the proper course of action is for [the Court] to accept jurisdiction and address the objection as an attack on the merits.'" *Goldman v. Gallant Securities, Inc.*, 878 F.2d 71, 73 (2d Cir.1989) (quoting *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d at 239). Accordingly, Defendants Carey and Hamilton's motions to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure are denied.

*Rule 12(b)(6)*

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir. 1998) (internal quotations omitted). Accordingly, in deciding a Rule 12(b)(6) motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *Harris v. City of New York,* 186 F.3d at 247. However, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

When deciding a Rule 12(b)(6) motion, the court generally limits itself to the facts stated in the complaint, documents attached to the complaint as exhibits, or documents incorporated by reference in the complaint. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999).

*Plaintiff's RICO Claims*

Section 1962 of Title 18 of the United States Code prohibits: (a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or whose activities affect interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern or racketeering activity;" (c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity;" and (d) conspiring to do any of the above. 18 U.S.C.A. § 1962 (West 2001). A showing of the existence of a "pattern of racketeering activity" is therefore a fundamental element of any civil RICO action.

"Racketeering activity," as defined under 18 U.S.C. § 1961(1), encompasses acts chargeable under certain state criminal laws, acts indictable under numerous specific federal criminal provisions, including mail and wire fraud, and any "offense" involving bankruptcy or securities fraud or drug-related activities that is "punishable" under federal law. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 481–82, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The state law offenses include murder, kidnaping, gambling, arson, robbery, bribery, extortion, and drug offenses. The federal law offenses include bribery, counterfeiting, theft, embezzlement, extortion, and obstruction of criminal investigations and enforcement. *See* 18 U.S.C. § 1961; *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. at 482, n. 3, 105 S.Ct. 3275.

Plaintiff asserts two causes of action under RICO, pursuant to 18 U.S.C. §§ 1962(c) and (d), against each of the Defendants except Charny and Cohen Weiss. To state a civil RICO claim under section 1962(c), the plaintiff must allege injury resulting from "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275; *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir. 1994). The cause of action under section 1962(d) requires a showing of a conspiracy to violate one or more of the substantive RICO provisions. *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.,* 187 F.3d 229, 244 (2d Cir.1999).

*Pattern of Racketeering Activity*

Under RICO, proof of a "pattern of racketeering activity" requires a showing of "at least two acts of racketeering activity" committed in a 10–year period. 18 U.S.C.A. § 1961(5); *De Falco v. Bernas*, 244 F.3d 286, 320 (2d Cir.2001); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d at 242; *Azrielli v. Cohen Law Offices*, 21 F.3d at 520. In order to establish such a pattern, the plaintiff must demonstrate that the predicate acts of racketeering activity by a defendant are "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Cofacredit*, 187 F.3d at 242. To satisfy the "continued criminal activity" element of the cause of action, a showing of either "closed-ended continuity" or "open-ended continuity" will suffice. *See H.J. Inc.*, 492 U.S. at 239, 241, 109 S.Ct. 2893.

*Closed-ended continuity*

"Closed-ended continuity is demonstrated by predicate acts that 'amount to continued criminal activity' by a particular defendant." *De Falco v. Bernas*, 244 F.3d at 321 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893). In order to establish closed-ended continuity, a plaintiff must prove "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement." *H.J. Inc.*, at 242, 109 S.Ct. 2893. Establishing closed-ended continuity requires that "a plaintiff must provide some basis for a court to conclude that defendants' activities were 'neither isolated nor sporadic.'" *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467 (2d Cir.1995).

"Since the Supreme Court decided *H.J. Inc.*, the Second Circuit has never held a period of less than two years to constitute a 'substantial period of time'" for purposes of the closed-ended continuity test. *De Falco v. Bernas*, at 321; *Cofacredit*, 187 F.3d at 242 (finding allegations of activity over a period of 1 ½ years insufficient to establish closed-ended continuity); *see also GICC Capital Corp.*, 67 F.3d at 466 (period of less than one year insufficient to demonstrate closed-ended continuity); *cf. Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir.1992) (finding closed-ended continuity when predicate acts occurred over a period of two years); *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir.1989) (finding closed-ended continuity when predicate acts occurred over a "matter of years").

Plaintiff's RICO statement, which appears to have been served on the Defendants, but not filed with the Court, alleges that the Defendants committed multiple acts of mail and wire fraud and embezzled union funds from early 1996 through 1997, as set forth in paragraphs 38–127 of the complaint. *See* Exh. B of Defendant Carey's Reply Memorandum in Support of Motion to Dismiss, at 6. In addition to the specific acts of alleged mail and wire fraud and embezzlement enumerated below, the complaint contains allegations that, in July of 1996, Defendants Jere Nash, Martin Davis and Charles Blitz devised a scheme to the defraud the IBT. *See* Complaint, ¶ 40. In addition, the complaint contains allegations that, in February and March of 1997, Defendants Charny and Cohen Weiss attempted to cover up the illegal campaign contributions to the TCFU by submitting affidavits to the Election Officer containing false statements concerning their determinations that TCFU contributors had complied with federal law and the election rules *See Id.* ¶¶ 121–127.

In determining the duration of a pattern of racketeering activity, courts focus solely on the predicate acts of racke-

teering each defendant is alleged to have committed. *DeFalco v. Bernas*, at 321; *see also H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893 (continuity test looks to period during which predicate acts were committed). Acts that do not constitute predicate racketeering activity are not included in the calculation for determining continuity. *Cofacredit*, 187 F.3d at 243 (citing *GICC Capital Corp.*, 67 F.3d at 467). The allegations in the complaint concerning Defendants' efforts to devise a scheme to defraud the IBT and Defendants Charny and Cohen Weiss's cover up do not describe racketeering activity as defined under 18 U.S.C. § 1961(1) and therefore are not taken into account for purposes of the Court's determination as to whether Plaintiff has alleged facts sufficient to support its assertion of closed-ended continuity. The alleged predicate acts of racketeering identified in the complaint consist of mail fraud, wire fraud and embezzlement, as follows:

*Mail Fraud:*

■ On or about October 14, 1996, Defendant Ansara mailed checks totaling $100,000 to a TCFU official in New York. Complaint, ¶ 153.

On or about October 21, 1996, Defendant Blitz mailed checks totaling $75,000 from California to Defendant Ansara in Massachusetts. *Id.*

On or about October 23, 1996, Defendant Ansara mailed checks totaling $75,000 from Massachusetts to Defendants Charny and Cohen Weiss in New York. *Id.*

On or about November 1, 1996, Defendant Ansara mailed a check from Defendant Arnold for $45,000 from Massachusetts to Defendants Charny and Cohen Weiss in New York. *Id.*

On or about November 15, 1996, Defendant Ansara mailed a check for $10,000 from Massachusetts to Defendants Charny and Cohen Weiss in New York. *Id.*

On or about November 27, 1996, Defendant Ansara mailed a check from Defendant Arnold for $50,000 from Massachusetts to Defendants Charny and Cohen Weiss in New York. *Id.*

These alleged acts occurred over a period of approximately 36 days.

*Wire Fraud:*

On or about October 14, 1996, Defendant Rochelle Davis requested via facsimile that $225,000 be sent from Washington, D.C. to Defendant Ansara in Massachusetts. *Id.* ¶ 154.

On or about October 15, 1996, Defendant Blitz had a telephone conversation from California with Defendant Charny and other Cohen Weiss attorneys in New York concerning TCFU contributions. *Id.*

On or about October 17, 1996, Defendant Carey had a telephone conversation with his executive secretary in Washington, D.C. during which he approved the IBT contributions to Project Vote and the NCSC. *Id.*

On or about October 23, 1996, Defendant Rochelle Davis requested via facsimile that $250,000 be sent from Washington, D.C. to Defendant Ansara in Massachusetts. *Id.*

On or about October 24, 1996, Defendant Nash had a telephone conversation with Defendant Carey concerning the IBT contribution to Citizen Action. *Id.*

On or about October 25, 1996, Defendants Charny and Cohen Weiss communicated by telephone or fax from New York to a TCFU official in Connecticut directing the official to mail a check for $100,000 to the November Group. *Id.*

On or about October 31, 1996, Defendant Carey had a telephone conversation with his executive secretary in Washington,

D.C. during which he approved the IBT contribution to the AFL–CIO. *Id.*

In October 1996, Defendant Ansara had a telephone conversation from Massachusetts with Defendant Charny in New York concerning Defendant Arnold's contributions. *Id.*

On or about November 7, 1996, Defendants Charny and Cohen Weiss communicated by telephone or fax from New York to a TCFU official in Connecticut, directing the official to mail a check for $45,000 to the November Group. *Id.*

On or about November 7, 1996, Defendants Charny and Cohen Weiss communicated by telephone or fax from New York to a TCFU official in Connecticut, directing the official to mail a check for $15,000 to the November Group. *Id.*

On or about December 5, 1996, Defendants Charny and Cohen Weiss communicated by telephone or fax from New York to a TCFU official in Connecticut, directing the official to mail a check for $59,000 to the November Group. *Id.*

The foregoing alleged predicate acts spanned a period of approximately 50 days.

*Embezzlement of Union Funds:*

In October 1996, the IBT contributed $475,000 to Citizen Action. *Id.* ¶ 155.

In October 1996, the IBT contributed $75,000 to Project Vote. *Id.*

In October 1996, the IBT contributed an additional $100,000 to Project Vote. *Id.*

In October 1996, the IBT contributed $85,000 to the NCSC. *Id.*

In November 1996, the IBT contributed $150,000 to the AFL–CIO. *Id.*

Plaintiffs allegations concerning the predicate acts involving embezzlement spanned a period of two months.

All of the predicate acts of racketeering identified by Plaintiff allegedly occurred within a two-month period. The Court finds that, with respect to each Defendant, Plaintiffs have failed to allege sufficiently closed-ended continuity.

*Open-ended Continuity*

■ To demonstrate open-ended continuity, "the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit,* 187 F.3d at 242 (citing *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893). In the Second Circuit, "cases assessing whether a threat of continuity exists have looked first to the nature of the predicate acts alleged or to the nature of the enterprise at whose behest the predicate acts were performed." *DeFalco v. Bernas,* at 323 (quoting *GICC Capital Corp.,* 67 F.3d at 466) (collecting cases) (internal quotations omitted). *See also Cofacredit,* 187 F.3d at 242; *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 97 (2d Cir.1997). "Where an inherently unlawful act is performed at the behest of an enterprise whose business is racketeering activity, there is a threat of continued criminal activity, and thus open-ended continuity." *DeFalco v. Bernas,* at 323; *see H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893 ("[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."); *see also Cofacredit,* 187 F.3d at 242; *GICC Capital Corp.,* 67 F.3d at 466. However, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves

implies a threat of continued criminal activity." *DeFalco v. Bernas,* at 321 (quoting *Cofacredit,* 187 F.3d at 243); *see also H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. 2893; *GICC Capital Corp.,* 67 F.3d at 466; *Azrielli,* 21 F.3d at 521.

Plaintiff argues that the RICO Defendants' predicate acts were inherently unlawful, and thus threatened continued criminal activity. Plaintiff's Memorandum in Opposition, at 16–18. In support of its argument Plaintiff cites *United States v. Aulicino,* 44 F.3d 1102 (2d Cir.1995). In that case, the court surveyed recent cases and observed that "where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity." *Id.* at 1111. The *Aulicino* court held that the acts of a kidnaping ring threatened future criminal activity because the methods used by the ring were likely to involve further crimes, because the kidnaping activities could have been continued in order to extort more money from the targets and because the ring had not exhausted its list of targets when the criminal enterprise was abandoned. *Id.* at 1113–1114. The "ring's activities ... were not a discrete and finite project that came to a natural end." *Id.* at 1114.

The complaint asserts that the Carey re-election campaign was an association-in-fact enterprise which conducted its affairs through racketeering activity for the purpose of defrauding the IBT for Defendant Carey's benefit, depriving IBT members of funds, their right to the honest services of their officers and employees and the IBT members' right to have the 1996 election conducted fairly. Complaint, ¶¶ 143–146.

Plaintiff argues that the long-term relationship among Defendants Carey, Martin Davis and the November Group, dating back to 1991, and between Carey and Cohen Weiss, dating back to 1967, supports a finding of a threat of continuity because the November Group and Cohen Weiss benefitted financially from their association with Carey and the IBT. Plaintiff's Memorandum in Opposition, at 19. Thus, Plaintiff contends, Carey and the other Defendants' long term association supports the inference that they could have continued to embezzle funds from the IBT, depriving the IBT and its members of the honest services of its officers and employees had Carey remained in office. *Id.* at 21.

The complaint, however, fails to set forth allegations sufficient to support a showing of open-ended continuity. The predicate racketeering acts specified in the complaint consist solely of mail fraud, wire fraud and embezzlement conducted during two months of the Carey re-election campaign in 1996. There is nothing in the complaint or in Plaintiff's RICO statement that identifies any racketeering activity prior to the 1996 re-election campaign or subsequent to Carey's re-election. Indeed, the last specific predicate act alleged in the complaint occurred in December 1996. Nor do the allegations in the complaint and Plaintiff's RICO statement support an inference that, but for the Election Officer's investigation, the Defendants would have continued to embezzle funds from the IBT.

Plaintiff contends that Defendants' attempts to cover up their wrongdoing in the campaign demonstrates just such a threat. Plaintiff's Memorandum in Opposition, at 23. The complaint alleges that Defendant Arnold participated in a telephone conversation with the Election Officer in February 1997 in which she falsely stated that no

one had solicited her contributions (Complaint, ¶ 120), and that Charny and Cohen Weiss submitted false affidavits in February 1997 and March 1997 concerning their monitoring of contributions to the TCFU. *Id.* ¶¶ 122–127. There are no allegations in the complaint or Plaintiff's RICO statement concerning a cover-up by any of the other Defendants. These allegations are insufficient to establish the requisite threat of continued criminal activity with respect to any of the Defendants.

The scheme alleged in the complaint involved the solicitation of campaign contributions to the TCFU from political organizations in return for illegal contributions to those political organizations from the IBT's treasury. There is nothing in the complaint to suggest that this illegal fundraising would have occurred absent the campaign. The allegations in the complaint go no further than describing a scheme with a finite goal: the re-election of Defendant Carey in the 1996 election. *See Cofacredit,* 187 F.3d at 244 ("an 'inherently terminable' scheme does not imply the threat of continued racketeering activity") (citation omitted).

Nor is the nature of the enterprise inherently unlawful. Rather, the complaint describes an effort to achieve a lawful purpose (Carey's re-election) through unlawful means. The contribution "swapping" and related predicate acts occurred in the campaign milieu and none of the facts alleged in the complaint supports an inference that the crimes alleged would have been continued after the election. Furthermore, to the extent the contention of open-ended continuity is predicated on Plaintiff's allegation that the purpose of the scheme was to "deprive IBT members of the honest services of its officers and employees," the complaint fails to identify a specific threat of *criminal,* as opposed to highly undesirable, activity going into the future.

Plaintiff urges that this Court should nonetheless find open-ended continuity, citing *United States v. Busacca,* 936 F.2d 232 (6th Cir.1991), *cert. denied,* 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991). In *Busacca,* the U.S. Court of Appeals for the Sixth Circuit held that the defendant's embezzlement of union funds for the purpose of funding his defense of a criminal action established a threat of continued criminal activity. Busacca, who was at the time the president of an IBT local, had been indicted on charges of embezzling funds from the union and its employee benefit plans. While those criminal charges were pending, Busacca sought authorization to pay his criminal defense expenses out of employee benefit plan funds. The complaint in the subsequent civil RICO action alleged that Busacca caused the funds to make such payments although he had not complied with conditions set by the funds' boards. The court found that, by nature of his position with the benefit plans, Busacca was able to exercise complete control over disbursement of their assets. 936 F.2d at 238. This embezzlement—six payments misappropriated over a period of approximately two and one-half months—constituted the predicate criminal activity for the RICO action. The activity ceased only upon Busacca's conviction on the underlying charges and consequent removal from his position with the employee benefit plan. In light of these facts, the court in *Busacca* found that, as of the time during which the predicate acts were occurring, the "manner in which the embezzlements occurred was capable of repetition indefinitely in to the future, as long as there were either legal fees or other expenses which Busacca wanted paid." *United States v. Busacca,* 936 F.2d at 238.

Unlike *Busacca,* where the embezzlement scheme was terminated by the fortui-

tous interruption of the racketeering activity by the conviction of the defendant, the embezzlement scheme alleged here began and terminated with the 1996 re-election campaign.

Accordingly, this case is unlike other cases where courts have found "a specific threat of repetition extending indefinitely into the future." *H.J. Inc.* at 242, 109 S.Ct. 2893.[4] At most, the allegations in the complaint, if proved, would establish that Defendants "engaged in a serious, but discrete and relatively short-lived scheme" to solicit illegal campaign contributions by promising IBT funds to donors. *See Cofacredit,* at 244. In light of the foregoing, the Court finds, that with respect to each Defendant, Plaintiff has not alleged facts sufficient to support open-continuity and accordingly has not alleged sufficiently the existence of a pattern of racketeering activity. Thus, Plaintiff's section 1962(c) claim must be dismissed.

*Section 1962(d)*

Defendants also move to dismiss Plaintiff's section 1962(d) claim on the ground that Plaintiff has (i) failed to state a claim under section 1962(c), and (ii) failed to plead facts showing the existence of a RICO conspiracy. Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of Section 1962(a)-(c). To state a claim thereunder, a plaintiff must allege that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise," *Colony at Holbrook, Inc. v. Strata, G.C., Inc.,* 928 F.Supp. 1224, 1238 (E.D.N.Y.1996).

There can be no RICO conspiracy without a substantive RICO violation. *See Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 353 (S.D.N.Y.1998). "Thus, if the prior claims do not state a cause of action for substantive violations of RICO, then a RICO conspiracy claim necessarily does not set forth a conspiracy to commit such violations." *Id.* (quoting *Discon v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996), *rev'd on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998)); *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 658 (S.D.N.Y.1996) ("failure to adequately plead facts that would satisfy the pleading requirements of 1962(a), 1962(b) or 1962(c) necessarily dooms any claim that the [plaintiff] might assert arising under 1962(d)"). Accordingly, because Plaintiff has failed to assert a substantive RICO claim for each Defendant, Plaintiff's claim under section 1962(d) must be dismissed.

*Malpractice Claims Against Cohen Weiss and Charny*

The complaint asserts state law malpractice claims against Cohen Weiss and Charny arising out of their alleged role in the re-election campaign. The Court declines to exercise its supplemental jurisdiction over these claims. Therefore, they will be dismissed.

*Motions for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure*

■ Defendant Charles Blitz seeks sanctions under Rule 11 in connection with his motion to dismiss.

As a threshold matter, a motion for sanctions under Rule 11 is required to "be

---

**4.** *Cf. United States v. Simmons,* 923 F.2d 934, 951 (2d Cir.), *cert. denied* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991) (open-ended continuity was found where three murders were intended to maintain discipline within a drug running enterprise); *United*

*States v. Coiro,* 922 F.2d 1008, 1017 (2d Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (a defendant's actions involving bribery and money laundering for organized crime established open-ended continuity).

made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision b" of the Rule. Fed. Rule Civ. P. 11. Defendant Blitz did not make a separate motion for sanctions under Rule 11, nor has Defendant Blitz described the specific conduct he alleges violates subdivision b of Rule 11. Accordingly, the motion of Defendant Blitz for sanctions under Rule 11 is denied. *See Shiffrin v. City of New York,* No. 96 Civ. 7112, 1998 WL 849407, at *5 (S.D.N.Y. Dec. 4, 1998) (collecting cases).

Defendant Carey asserts, in a separately filed motion under Rule 11, that sanctions are appropriate because Plaintiff's complaint asserts a "closed-ended" pattern of racketeering activity and the factual allegations are insufficient to support a finding of such a pattern. Defendant Carey contends that, because the Second Circuit has held that predicate acts extending over a period of less than two years do not constitute a substantial period of time for purposes of the close-ended continuity test, the allegations in the complaint are not warranted by existing law. In support of its motion for Rule 11 sanctions, Defendant Carey cites cases in which courts have imposed sanctions under Rule 11 in RICO actions, but those cases involve deficiencies that go far beyond the failure of a complaint to allege sufficiently closed-ended continuity.[5] As discussed herein, Plaintiff's complaint can be made out to allege both closed-ended and open-ended continuity. While the Court has determined that the complaint does not satisfy either the closed-ended or open-ended continuity test for purposes of stating a RICO cause of action, Plaintiff's allegations are neither frivolous nor unwarranted by existing law. Accordingly, the motion of Defendant Carey for sanctions under Rule 11 is denied.

## CONCLUSION

For the foregoing reasons the motions to dismiss of Defendants Ron Carey, William Hamilton, Martin Davis, the Share Group, Inc., Michael Ansara, Barbara Arnold, Ira Arlook, Charles Blitz and Rochelle Davis are granted insofar as they are brought pursuant to Federal Rule of Civil Procedure 12(b)(6) and denied insofar as they are brought pursuant to Federal Rule of Civil Procedure 12(b)(1). The motions of Defendants Ron Carey and Charles Blitz for sanctions pursuant to Rule 11 of the Federal Rules of Civil are denied. In addition, the Court declines to exercise its supplemental jurisdiction over the state law claims against Defendants Charny and Cohen Weiss.[6] Any amend-

---

**5.** For example, in *Hartz v. Friedman,* 919 F.2d 469, 474–75 (7th Cir.1990), the court affirmed the imposition of Rule 11 sanctions where it found, among other things, that the unwieldy 125 page complaint failed to set forth any relationship or continuity among the predicate acts alleged and the plaintiff had made a "frivolous" motion to strike the defendant's motion to dismiss. In *O'Malley v. New York City Transit Authority,* 896 F.2d 704, 706–709 (2d Cir.1990), the Second Circuit directed the imposition of sanctions for the pursuit of a "baseless" RICO cause of action with respect to a " 'simple claim made by an employee that he was wrongfully terminated' " where a judicial officer had specifically advised the plaintiff to withdraw the complaint. In *West Mountain Sales, Inc. v. Logan Mfg. Co.,* 718

F.Supp. 1084, 1086 (N.D.N.Y.1989), the court did not impose Rule 11 sanctions, in part, as Defendant Carey asserts, because the Supreme Court had only recently clarified the continuity test under RICO, but also because the court was satisfied that the filing was not objectively unreasonable. In *Vild v. Visconsi,* 956 F.2d 560, 569, 570–71 (6th Cir.1992), the court of appeals remanded the district court's denial of defendant's Rule 11 motion because the district court had not provided a basis for its decision.

**6.** The Court does not reach Defendant Barbara Arnold's and the Share Group's motions to dismiss pursuant to Fed.R.Civ.P. 9(b) because its determination on the Defendants' Rule 12(b)(6) motions is dispositive.

ment of the complaint as of right shall be served and filed within 30 days of the date of this Opinion and Order.

SO ORDERED.