UNITED STATES of America,
Plaintiff–Appellee,

v.

Salvatore T. "Sam" BUSACCA,
Defendant–Appellant.

No. 90–3315.

United States Court of Appeals,
Sixth Circuit.

Argued March 14, 1991.

Decided June 10, 1991.

Joseph Douglas Wilson (argued), U.S. Dept. of Justice, Crim. Section, Washington, D.C., Michael T. Rae, Strike Force, Organized Crime Div., Cleveland, Ohio, for plaintiff-appellee.

Mark R. DeVan (argued), Cleveland, Ohio, for defendant-appellant.

Before KRUPANSKY and BOGGS, Circuit Judges, and WOODS, District Judge.*

WOODS, District Judge.

After a jury trial in the United States District Court for the Northern District of Ohio, the Honorable Ann Aldrich presiding, defendant Salvatore T. "Sam" Busacca was convicted of six counts of embezzling funds from an employee benefit plan in violation of 18 U.S.C. § 664 and one count of participating in the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).[1] At the close of trial, Busacca filed a motion for acquittal. The motion was denied, 739 F.Supp. 370, and Busacca was sentenced to terms of imprisonment of four years on each count, the terms to run concurrently. Busacca now appeals his conviction and sentence. For the reasons stated herein, we affirm.

## I. Background.

Busacca was president of the Excavating, Building Material, Construction Drivers, Race Track Employees, Manufacturing, Processing, Assembling, and Installer Employees Local 436 of the International Brotherhood of Teamsters ("Local 436") located in Cleveland, Ohio. Local 436 has established a Health and Welfare Fund and a Pension Fund (the "Funds") for the benefit of its members. The Funds are subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). Both Funds are controlled by a single Board of Trustees (the "Board"), composed of six union representatives and six representatives drawn from the businesses whose employees are represented by Local 436. In addition to his position as

president of Local 436, Busacca also served as the chairman of the board of trustees of the Funds.

On April 14, 1986, a grand jury in the Northern District of Ohio returned a 39-count indictment charging Busacca with various criminal offenses of embezzling monies from Local 436 and the Funds, accepting kickbacks to influence the operation of the Funds, making false statements on documents relating to the Funds, engaging in mail fraud, filing false income tax returns, and violating the provisions of RICO ("Busacca I"). The indictment also charged Deborah Hanson, Busacca's secretary and the office manager of the Funds, with embezzlement and false statement offenses. After a jury trial in the United States District Court for the Northern District of Ohio, the Honorable George W. White presiding, Busacca was convicted on 16 of the 39 counts. Defendant's conviction was later affirmed by this Court. United States v. Busacca, 863 F.2d 433 (6th Cir.1988). It is Busacca's endeavor to have the Funds pay for his legal defense fees in Busacca I which forms the crux of the present indictment, prosecution, conviction and appeal ("Busacca II").

## II. Facts.

At a meeting of the Board of Trustees on May 12, 1986, Busacca asked counsel for the Pension Fund, Stanley Gottsegen, and counsel for the Health and Welfare Fund, Joseph Kalk, for a joint legal opinion regarding the propriety of an advancement of legal fees by the Funds for the defense of himself and Hanson in Busacca I. At a June 2, 1986 meeting of the Board of Trustees, Kalk and Gottsegen reported that they had found no statute, regulation or judicial opinion which either prohibited or allowed a pension or welfare fund to advance legal fees to a fiduciary of the fund for the defense of a criminal indictment arising out

---

* The Honorable George E. Woods, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Busacca was acquitted on one count of conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity.

Three codefendants, Gary Tiboni, Mike Paventi, and Sam Busacca, Jr., were acquitted on all counts. A fourth codefendant, Pat Lanese, became ill during trial and a mistrial was declared as to him. All charges against Lanese were subsequently dismissed.

of his fiduciary responsibilities. However, Gottsegen nevertheless concluded that the Board should not advance legal fees to either Busacca or Hanson.

Also on June 2, 1986, the Department of Labor notified the Board of Trustees by letter that, in the Department's view, any advancement of legal fees to either Busacca or Hanson would be a violation of the fiduciary responsibility provisions of ERISA requiring the Trustees to act in the best interests of the participants and beneficiaries of the plans.

The Board held a special meeting the next day on June 3, 1986, to discuss the advancement of legal fees to Busacca and Hanson. At that meeting, the Board agreed to advance the legal fees subject to the alternative conditions that either the Department of Labor give prior approval for the advancements or that the legality of the advancements be determined in a declaratory judgment action. As to the former condition, the Department of Labor sent a second letter to the Board dated June 6, 1986, reiterating its position that any advancement of legal fees to either Busacca or Hanson would be viewed as a violation of the fiduciary responsibilities imposed by ERISA. As to the latter condition, no declaratory judgment action was ever commenced.[2] Instead, on June 17, 1986, Busacca sought and obtained approval from the Board to seek an independent legal opinion regarding the propriety of the advancement of legal fees to Hanson and himself. Busacca first contacted Cleveland attorney George Faulkner who stated in an opinion letter dated June 23, 1986, that although the advancement of legal fees to an ERISA fiduciary for the defense of a criminal indictment arising out of his fiduciary responsibilities would not be a *per se* violation of ERISA, the Department of Labor would have grounds to challenge the advancement. However, there was no evidence that Busacca ever informed the Board of the exact details of Faulkner's opinion even though the Board later approved payment for Faulkner's services in rendering his opinion.

Busacca next sought the opinion of Washington, D.C. attorney Gerald Feder. At Busacca's request, Feder was asked to address only the propriety of an advancement of legal fees to Hanson. The Feder opinion letter stated that the Funds could pay for Hanson's legal defense fees if it were determined after a thorough investigation by independent counsel that the charges against Hanson were without merit and that she had acted in good faith, and then only if the Funds had the financial resources to pay the fees.[3] Upon receipt of this letter, Busacca told Hanson not to present it to the Board. Busacca also never presented to the Board the $11,000 bill submitted by Feder for the payment of his services.

Busacca next sought the opinion of Chicago attorney Albert Grasso, but again only as to the propriety of an advancement of legal fees as to Hanson. In early 1987, Busacca obtained an oral opinion from Grasso that the Funds could advance legal fees to Hanson subject to certain conditions. Finally satisfied with the results of his legal search, Busacca asked Grasso to come to Cleveland and personally deliver his opinion to the Board. At a board meeting on March 12, 1987, Grasso opined that the Funds could advance monies for Hanson's criminal defense if it were determined after an independent investigation by the Board that Hanson was not culpable of the charges in the indictment, and if Hanson executed a repayment agreement stating that if found culpable she would repay the advanced fees. Apparently, the Board adopted the opinion of Grasso since Hanson was immediately issued a check for $100,000 upon presentation of her attorney's pre-prepared invoice and upon her execu-

2. On September 9, 1986, the Board retained Chicago and Cleveland law firms to file a declaratory judgment action to determine the legality of the advancement of legal fees to Busacca and Hanson. However, no such action was ever filed.

3. The government presented evidence at trial to show that at the time Busacca was seeking an advancement of legal fees, the net assets of the Funds had declined to the point that revenues were sometimes insufficient to immediately cover the claims of participants and beneficiaries.

tion of a repayment agreement. No monies were advanced to Busacca at that time, however, since he specifically told the Board that he was not then in need of any advancement of legal fees.

At the March 12, 1987 Board meeting, Pension Fund counsel Gottsegen asked Grasso to put his opinion in writing. When Grasso refused to do so immediately, Gottsegen resigned.[4] Two employer trustees also resigned after this meeting. The Department of Labor also sent a third letter to the Board reaffirming its position that the advancement of legal fees to Hanson violated ERISA and that it would use its enforcement authority to seek restoration of the fees (which it eventually did in a related civil suit; see discussion at Part III, Section 4, infra).

The criminal trial of Busacca and Hanson commenced in May, 1987 and continued until August, 1987. Throughout the trial, an attorney from Kalk & Valore, the Cleveland law firm representing the Welfare and Pension Funds as general counsel, attended the proceedings and periodically reported to the Board that no persuasive evidence of Busacca's or Hanson's guilt had been presented by the government.

At a May 31, 1987 meeting of the Board, a formal policy was adopted to advance legal fees to trustees in connection with grand jury investigations and legal prosecutions if the Board independently determined that there was no evidence that the trustee was culpable of any criminal act or breach of fiduciary duty and if the trustee agreed to repay the amount advanced if found guilty or liable. The Board further determined that there was no credible evidence to support any claim of culpability against Busacca or Hanson in Busacca I. However, at this meeting the Board did not, nor did it ever, specifically authorize the payment of Busacca's attorney fees.

The government presented evidence at trial that any requests for attorney fees in connection with the May 31, 1987 policy were expected by the Board to be presented to it for approval as had occurred at the March 12, 1987 meeting when the Board authorized the payment of Hanson's legal fees. The Board's established responsibilities at this time included, inter alia, approving large expenditures by the Funds for professional expenses, including legal fees, except those professional expenses incurred pursuant to a retainer agreement already approved by the Board. The Board regularly met about once a month at which time such expenditures were either approved or disapproved. Occasionally, if payment of a bill was necessary between meetings, the Board collaborated by telephone to determine its approval.

Beginning on June 5, 1987, and continuing through August 19, 1987, a series of six Welfare Fund checks totaling $259,435.00 were issued to Busacca, ostensibly for the payment of his legal fees in Busacca I. Specifically, Busacca was issued checks on June 5, 1987 for $110,000; on June 25, 1987 for $50,000; on July 17, 1987 for $30,000; on July 31, 1987 for $25,000; on August 13, 1987 for $19,000; and on August 19, 1987 for $25,435.[5] During this time period, Busacca had received invoices from his attorney for $83,288; $58,694; $44,958; and $25,435. The total invoices for attorney fees thus amounted to $212,375.00. After each check was issued to Busacca, he executed a repayment agreement stating that he would repay the amounts advanced if found guilty. None of these invoices were ever presented by Busacca to the Board for approval. Nor did the full Board ever authorize the issuance of any of the checks to Busacca. Nor was the Board ever made aware of the repayment agreements executed by Busacca.

---

4. Grasso later sent a written opinion letter to the Board of Trustees dated March 16, 1987, reiterating his previously stated position.

5. At this time, Welfare Fund checks were required to be signed by the office manager and one other trustee. All checks issued to Busacca were signed by codefendant Pat Lanese, the office manager at that time. Three were co-signed by codefendant Gary Tiboni, two by codefendant Mike Paventi, and one by codefendant Romeo Turchi. All of the checks were prepared by codefendant Sam Busacca, Jr., an administrative employee of the Pension and Welfare Funds.

### III. Analysis.

#### 1. RICO—Pattern of Racketeering Activity.

■ Busacca argues that the RICO conviction should be reversed since the government failed to establish the necessary element of a "pattern of racketeering activity." Busacca argues that the predicate acts alleged here were isolated events, limited in scope and duration, and thus posed no threat of long term, continuing racketeering activity.

RICO provides in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). RICO specifically includes within the definition of *racketeering activity* a host of offenses, including the embezzlement of monies from an employee welfare or pension fund in violation of 18 U.S.C. § 664. 18 U.S.C. § 1961(1). RICO then delineates (but does not define) a *pattern* of racketeering activity as requiring at least two predicate acts or offenses. 18 U.S.C. § 1961(5). Here, six predicate acts of racketeering activity are alleged to have occurred, i.e. six violations of § 664, with each violation corresponding to one of the six Welfare Fund checks misappropriated by Busacca.[6] The issue is whether these six instances of racketeering activity are sufficient to form a *pattern* of racketeering and thereby justify a conviction under RICO.

In the recent case of *H.J. Inc. v. Northwestern Bell Telephone, Inc.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court explained RICO's pattern of racketeering activity requirement. The Court stated that a pattern of racketeering activity can be established by showing that "the racketeering predicate acts are related, *and* that they amount to or pose a threat of continuing criminal activity." *Id.*

109 S.Ct. at 2900. Thus, there are essentially two elements of a pattern of racketeering activity which, in their abbreviated form, have come to be known as "relatedness" and "continuity." Here, Busacca does not argue that the predicate acts were not related. Rather, he argues that the predicate acts fail to pose any threat of long term criminal activity, i.e. they lack continuity.

The Supreme Court explained the continuity requirement in *H.J. Inc.*:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. (citation omitted; emphasis in original).

*H.J. Inc.*, 109 S.Ct. at 2902.

■ In the instant case, the six predicate acts of Busacca occurred over a relatively short period of time. Six checks totalling $258,435.00 were misappropriated from the Funds over a period of approximately two and one half months. Accordingly, we are concerned with an open-ended period of continuity where the threat of continued criminal activity must be shown in order to

---

**6.** *See* discussion at Part III, Section 2, *infra,* for an analysis of the "two or more predicate acts" requirement of RICO as applied here.

sustain the RICO conviction. The threat of continued criminal activity is a fact specific concept. It may be established by any number of possibilities, such as by showing that the related predicates themselves involve a distinct threat of long term racketeering activity, either implicit or explicit, or by showing that the predicate acts or offenses are a part of an ongoing entity's regular way of doing business. *H.J. Inc., id.* at 2902. Thus, the threat of continuity need not be established solely by reference to the predicate acts alone; facts external to the predicate acts may, and indeed should, be considered. In sum, the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing criminal activity. *See United States v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990).

In the instant case, Busacca's willingness to disregard established Board procedures for the disbursement of checks, his position of control over the Union and the Funds, his secretive concealment and affirmative misrepresentations to the Board regarding the advanced monies, and his obvious attorney shopping for a legal opinion consistent with his objectives were sufficient to establish a threat of long term, continuing criminal activity. The manner in which the embezzlements occurred was capable of repetition indefinitely into the future, as long as there were either legal fees or other expenses which Busacca wanted paid.

■ In this regard, Busacca argues that the predicate acts were finite in nature, i.e. they necessarily came to an end once the jury returned a verdict of guilty, his legal representation terminated, and he was removed from the Board of Trustees, and after which time he would be further required to repay the amounts advanced. This argument is without merit. An analysis of the threat of continuity cannot be made solely from hindsight. All racketeering activity must necessarily come to an end sometime. The lack of a threat of continuity of racketeering activity cannot

be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict.

Rather, in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred. Here, there was nothing to stop Busacca from continuing to misappropriate monies from the Funds had he been acquitted of the charges in *Busacca I*. Busacca had demonstrated his complete ability to control the dispensation of monies from the Funds while doggedly pursuing and establishing his scheme to have his legal fees paid by the Funds. This ability, undiminished by his removal from the Funds as trustee, forms an implicit threat of continuity. Other courts have reached a similar conclusion. *See, e.g., Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 144–45 (D.C.Cir.1989) (four threats of violence against a bus company by union members during a four day strike period were deemed sufficient to allege a pattern of racketeering activity since the threats could be found to be the means of conducting the strike which in turn could have continued for an indefinite period of time), *overruled en banc on other grounds*, 913 F.2d 948 (1990); *United States v. O'Connor*, 910 F.2d 1466, 1468 (7th Cir.1990) (several predicate acts of extortion committed by a policeman over a period of two months were sufficient to form a pattern of racketeering activity since the policeman was found to have "committed himself to an enduring series of criminal acts...."), *cert. denied*, — U.S. ——, 111 S.Ct. 953, 112 L.Ed.2d 1041 (1991). Thus, based upon the totality of the circumstances presented here, we find implicit in Busacca's actions a threat of continuity sufficient to establish a pattern of racketeering activity under RICO.

### 2. Embezzlement—Two or More Predicate Acts.

■ Busacca next argues that the government failed to establish the requisite two or more predicate acts necessary for a RICO violation since the government improperly split up one offense of embezzle-

ment into six separate offenses and hence one predicate act into six predicate acts. Generally, an indictment may not charge a single criminal offense in several counts without offending the rule against "multiplicity." *United States v. Robinson,* 651 F.2d 1188, 1194 (6th Cir.), *cert. denied,* 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 183 (1981). Busacca argues that the present indictment improperly charged six embezzlement offenses under 18 U.S.C. § 664 when in fact only one alleged scheme of embezzlement occurred, that being Busacca's attempts to have his legal defense fees paid by the Funds.

18 U.S.C. § 664 reads in relevant part: Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds ... or other assets of any employee welfare benefit plan or employee pension benefit plan ... shall be fined not more than $10,000, or imprisoned not more than five years, or both.

The government contends that the use of the phrase "any moneys" indicates the intent of Congress that each taking of funds from an employee benefit plan constitutes a separate violation of the statute. Thus, each time defendant caused a check to be issued by the Funds, the government argues he inflicted a separate injury on the members of the Funds. Although no case has been reported addressing the allowable units of prosecution under § 664, other similar cases support the government's argument. *See, e.g., United States v. Esch,* 832 F.2d 531, 541–42 (10th Cir.1987) (each pornographic photograph of a child amounted to a separate violation of 18 U.S.C. § 2251(a) even though several of the photos were taken at the same session), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 *cert. denied,* 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1981); *United States v. Fermin–Castillo,* 829 F.2d 1194, 1199 (1st Cir.1987) ("each use of the wires constitutes a separate crime under 18 U.S.C. § 1343, even if the several uses are in pursuance of but one single criminal enterprise"); *United States v. Marquardt,* 786 F.2d 771, 777–78 (7th Cir.

1986) (three separate misappropriations of bank funds constituted three violations of 18 U.S.C. § 657 even though all three misappropriations were a part of the same course of conduct); *United States v. Blakenship,* 746 F.2d 233, 236 (5th Cir.1984) (each separate use of the mails constituted mail fraud even if made pursuant to a single scheme to defraud). These four examples certainly are not exhaustive. Here, we conclude that each time Busacca caused a check to be issued by the Funds to himself without prior Board approval and without following established Board procedures, a separate violation of § 664 occurred. Accordingly, Busacca's argument that the indictment was multiplicitous is without merit. Moreover, since Busacca caused six checks to be issued to himself in violation of § 664, it follows that there were clearly two or more predicate acts present to sustain the RICO conviction. *See* 18 U.S.C. § 1961(1) ("racketeering activity" is defined to specifically include violations of 18 U.S.C. § 664).

*3. Evidence to Sustain the § 664 Convictions.*

Busacca next contends that the district court erred in denying his motion for acquittal since the government failed to produce sufficient evidence to establish beyond a reasonable doubt the necessary specific intent to sustain the § 664 violations. This Court must review the denial of a motion for acquittal *de novo* under the standard of "whether, after reviewing all the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Ingrao,* 844 F.2d 314, 315 (6th Cir.1988) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

The purpose of § 664 is to "preserve the designated funds for those entitled to their benefits." *United States v. Andreen,* 628 F.2d 1236, 1242 (9th Cir. 1980). To prove a violation of § 664, the government must show that a defendant (1) embezzled (2) funds (3) from an employee

benefit plan, and (4) with the specific intent to deprive the plan of its funds. The existence of the defendant's criminal intent under § 664 is a question of fact for the jury. *United States v. Ford*, 632 F.2d 1354, 1362 (9th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). Furthermore, a good faith intent to return embezzled funds does not negate a showing that the defendant acted with the requisite criminal intent to embezzle the funds in the first instance. *United States v. Shackleford*, 777 F.2d 1141, 1144 (6th Cir. 1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986).

In the instant case, ample evidence was presented to the jury to enable it to conclude that Busacca embezzled monies from the Funds for his own use. From the outset of his indictment in April, 1986, through his conviction in August, 1987, Busacca concealed facts and made affirmative misrepresentations to the Board of Trustees concerning the advancement of monies for his legal defense fees. Busacca obviously shopped around for a legal opinion consistent with his objectives. Busacca then secretly received numerous checks from the Funds issued to himself, without prior Board approval and without following the Board's established procedures for the disbursement of monies for professional fees. From the above facts, a reasonable jury could conclude that Busacca acted with the specific intent to deprive the Funds of monies for his own personal benefit each time he caused the Funds to issue a check to himself. Moreover, a reasonable jury certainly could have rejected Busacca's feigned good faith reliance upon the procured legal opinion regarding the legality of the advancements, an issue which the jury was adequately instructed upon by the district court.

### 4. *Judicial Estoppel.*

■ Finally, Busacca contends that the government was judicially estopped from asserting in the indictment or at trial that any payment of his legal fees by the Funds was illegal due to an alleged contrary position taken by the government in a related civil case. "The doctrine of judicial estoppel applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982).

The previous related civil matter concerned the Department of Labor's action seeking reimbursement from the individual trustees of the monies advanced for Busacca's and Hanson's legal fees. *Dole v. Busacca, et al.*, No. C88–0800 (N.D.Ohio 1988). In *Dole*, the government asserted in its complaint that on May 31, 1987, the Board of Trustees voted to adopt a policy which allowed the advancement of legal fees. In response to a motion for summary judgment filed by one of the trustees (not Busacca), the government summarized that trustee's position as being that he "did not participate in the vote to advance legal fees [to Busacca]". In the same pleading, the government restates a portion of the trustee's affidavit in support of summary judgment which quotes minutes from the May 31st Board meeting "where the Board authorized legal fee advancements to both Hanson and Busacca." It is quite obvious that the above two assertions are not positions of the government at all, but rather merely summaries of the positions asserted by the trustee in his motion for summary judgment. Nevertheless, Busacca argues that the government was estopped from asserting at his criminal trial that the Board of Trustees had not approved the advancement of his legal defense fees in *Busacca I.*

The same argument of Busacca was addressed by the district court in a motion prior to trial. The motion was denied by the district court for several reasons: (1) the government's position in the civil case was not inconsistent with the position taken in the criminal case since the civil case involved the issue of whether the Board of Trustees had adopted a policy for the payment of legal fees and the criminal case involved the issue of whether the defendant had obtained proper authorization for the payment of his legal fees from the

Board of Trustees; and (2) the government's "position" in the civil case was not unequivocal, nor had it prevailed in the context which it was asserted since the trustee's motion for summary judgment was denied and thus issues of fact remained to be decided. This Court finds no error with the reasoning and conclusion of the district court.

### IV. Conclusion.

For the reasons stated above, the conviction and sentence of defendant on six counts of embezzlement from an employee benefit plan under 18 U.S.C. § 664 and one count of participating in the affairs of an enterprise through a pattern of racketeering activity under RICO, 18 U.S.C. § 1962(c), is hereby AFFIRMED.