**THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
Plaintiff,

v.

Ron CAREY, William Hamilton, Jere Nash, the November Group, Inc., Martin Davis, the Share Group, Inc., Michael Ansara, Barbara Arnold, Citizen Action Management Fund, Ira Arlook, Charles Blitz, Rochelle Davis, Cohen, Weiss and Simon, and Nathaniel Charny, Defendants.

No. 00 CIV.2952 LTS.

United States District Court,
S.D. New York.

Jan. 29, 2004.

Seiff Kretz & Maffeo, by J. Bruce Maffeo, Walter A. Kretz, New York City, for Plaintiff.

Robert J. Boyle, New York City, for Defendant William Hamilton.

Judith Brown Chomsky, Elkins Park, PA, for Defendant Ron Carey.

Akin, Gump, Strauss, Hauer & Feld, LLP, by Mark J. MacDougall, Michael J. Mueller, Washington, D.C., for Defendants Ira Arlook and Rochelle Davis.

Gerald B. Lefcourt, P.C., by Sheryl E. Reich, New York City, for Defendant Charles Blitz.

## OPINION AND ORDER

SWAIN, District Judge.

Plaintiff, the International Brotherhood of Teamsters ("IBT"), brings this action pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), alleging that Defendants defrauded the IBT of funds which were used improperly to promote Defendant Ron Carey's ("Carey") 1996 candidacy for re-election as the IBT's General President. Following the issuance of the Court's October 1, 2001, Opinion and Order granting in part, and denying in part a motion to dismiss the complaint in this case, Plaintiff filed an amended complaint (the "Amended Complaint"). Defendants Ron Carey, William Hamilton, Michael Ansara, Barbara Arnold, Ira Arlook, Charles Blitz, Rochelle Davis, Nathaniel Charny, Martin Davis, The Share Group, Inc., Cohen & Weiss have moved pursuant to Federal Rules of Civil Procedure 12(b)(6) to dismiss the Amended Complaint. Subsequent to the service of Defendants' motion to dismiss, the case was dismissed consensually as against Defendants Martin Davis, Barbara Arnold, Michael Ansara, the Share Group, Cohen Weiss and Simon ("Cohen Weiss") and Nathaniel Charny.[1] The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

For the reasons set forth below, the motions of Defendants Carey, Hamilton, Ira Arlook, Rochelle Davis, Charles Blitz are granted with respect to Plaintiff's fed-

eral claims; Plaintiff's state common law claims will be dismissed without prejudice.

## BACKGROUND [2]

In 1988, the Government filed a civil RICO action against the IBT and its leadership. In connection with the 1988 lawsuit against the IBT the Government sought, among other relief, to establish Government supervision of the election of IBT officials. Amended Complaint, ¶ 27. In March 1989, the Government and the IBT entered into a consent decree settling the Government's claims against IBT. The consent decree provided, among other things, for direct, secret ballot, elections of IBT officers and further provided that the court would appoint an election officer (the "Election Officer") to supervise the election in 1991 for IBT national officers and, if the Government so requested, the 1996 election. *Id.* ¶ 28. The consent decree also authorized court-appointed officers to investigate and sanction IBT members and officers for violations of the IBT constitution and federal law. *Id.* Beginning in 1992, pursuant to the terms of the consent decree, an Independent Review Board ("IRB") assumed responsibility for determining whether members or officers had violated the IBT Constitution and federal law. *Id.*

The Government exercised its right to have the 1996 IBT election supervised pursuant to the consent decree. *Id.* ¶ 30. The court gave the Election Officer authority to supervise the 1996 election and approved rules governing the conduct of the 1996 election. The election rules prohibited the use of IBT funds to promote

---

1. The original complaint was dismissed voluntarily as to Defendants Nash and November Group, Inc. in July 2000. Citizen Action Management Fund was not named as a defendant in the Amended Complaint.

2. The following facts are taken from the Amended Complaint and Plaintiff's Amended RICO statement, the factual allegations of which are accepted as true for purposes of this motion.

the candidacy of any individual and barred employers from contributing to the election campaign or soliciting contributions for any candidate. *Id.* ¶ 31.

Defendant Carey and James P. Hoffa campaigned in the 1996 election for IBT General President. Carey was declared the winner in a close and hotly contested election. *Id.* ¶ 32.

On August 21, 1997, the Election Officer invalidated the 1996 election on several grounds, one of which was that the Carey re-election campaign had engaged in improper fund-raising that involved the use of IBT funds to promote Carey's candidacy. The Election Officer ordered a rerun election. *Id.* ¶ 33. In July 1998, the IRB permanently barred Carey from IBT membership after finding that Carey had violated his fiduciary duties and knowingly derived personal benefit from improper election campaign contributions in connection with the 1996 election. *Id.* ¶ 37. The IRB also permanently barred Defendant Hamilton from holding any office or having any employment relationship with the IBT upon finding that Hamilton had embezzled IBT funds and had brought reproach on the IBT. *Id.* ¶ 38.

In late 1998, a rerun election was held and Hoffa was elected IBT General President. IBT expended approximately $2.2 million in costs associated with the supervision of the 1998 rerun election. IBT also incurred costs for attorneys' fees in connection with the Government's investigation into the 1996 election. *Id.* ¶ 39.

Defendants Hamilton, Nash, Martin Davis, Ansara, Blitz and Charny were thereafter prosecuted on federal criminal charges. Defendant Martin Davis pleaded guilty to conspiracy and making false statements to the Election Officer, Defendant Ansara pleaded guilty to conspiring to embezzle union funds, to commit mail fraud, and to making false statements to the Election Officer, and Defendant Blitz pleaded guilty to making false statements to the Election Officer. *Id.* ¶ 41. Defendant Hamilton was convicted after trial of conspiracy, embezzlement, mail and wire fraud, making false statements. *Id.* ¶ 43. Defendants Arlook and Rochelle Davis entered into non-prosecution agreements with the Government in which they agreed to cooperate in the Government's investigation of the conduct that is the subject matter of the Amended Complaint. *Id.* ¶ 44.

In connection with the 1996 election, Defendants devised and executed certain schemes to defraud the IBT and embezzle funds from it. *Id.* ¶ 47. Defendants needed to raise funds for Defendant Carey because the race with Hoffa was very close and the Hoffa election campaign was raising more funds than the Carey election campaign. Defendants were aware that, if Defendant Carey lost the election, Defendants would lose their positions and their relationships with the IBT. *Id.* ¶ 48.

In or about July 1996, Defendant Nash, Martin Davis and Ansara devised a scheme to defraud the IBT by causing the IBT to contribute funds to designated organizations in exchange for contributions by wealthy individuals to the Carey election campaign. *Id.* ¶ 49. In connection with this scheme, Cohen Weiss and Charny established a fund-raising committee, Teamsters for a Corruption Free Union ("TCFU"), to accept donations to the Carey campaign. *Id.* ¶ 51. TCFU established a separate bank account for donations to Carey's campaign. *Id.* Defendants Martin Davis, Ansara and Blitz agreed to solicit donors for Carey's re-election campaign. *Id.* ¶ 52. The Defendants induced donors to make contributions by promising that the IBT would make contributions, in amounts larger than the amounts the donors contributed to the Carey campaign, to

certain political organizations or advocacy groups designated by the donors. *Id.* ¶ 53.

In or about October 1996, Ansara and Blitz met numerous times in Santa Monica, California. They and Martin Davis agreed that Charles Blitz would send the donors' checks to Michael Ansara, who would hold the checks pending confirmation that a reciprocal IBT contribution had been made. *Id.* ¶ 55. Michael Ansara agreed that, once the IBT approved the reciprocal contribution, he would forward the donors' checks to the TCFU in New York. *Id.* ¶ 56. At the direction of Martin Davis, Defendant Nash contacted Defendant Hamilton, who agreed to seek Carey's approval of the scheme. *Id.* ¶¶ 60–61. The IBT could not make the contributions without Carey's approval. *Id.* ¶ 62.

In or about October 1996, Blitz asked Defendant Rochelle Davis, the Financial and Administrative Director of Citizen Action, a lobbying organization concerned with federal, state and local issues, to request a $225,000 contribution from the IBT. *Id.* ¶ 63. On or about October 14, 1996, Arlook and Rochelle Davis directed a Citizen Action employee to send a written request for $225,000 to Hamilton with a copy to Michael Ansara. On or about October 23, 1996, Arlook and Rochelle Davis, at Blitz's direction, sent a request to Hamilton seeking a second contribution in the amount of $250,000. The total amount requested by Citizen Action was $475,000. *Id.* ¶¶ 64–65.

Martin Davis thereafter asked Nash to ask Hamilton to recommend to Carey that the IBT make the contributions to Citizen Action. Nash met with Carey's executive secretary in mid-October 1996 in order to explain the scheme. Then, on or about October 16, 1996, Nash spoke with Carey by telephone and explained that the IBT contributions to Citizen Action would benefit Carey's re-election campaign. Carey

told Nash that he would approve the contribution to Citizen Action. *Id.* ¶¶ 66–69. On or about October 23, 1996, Hamilton sent Carey a memo recommending approval of the Citizen Action contributions. On or about October 24, 1996, Carey approved the check request for Citizen Action. *Id.* ¶¶ 70–71. In or about October 1996, the IBT contributed $475,000 in IBT General Treasury funds to Citizen Action. *Id.* ¶ 72.

In or about October 1996, Nash asked Hamilton to recommend an IBT contribution to Project Vote, an organization whose goal was to mobilize low income and minority voters. On or about October 17, 1996, Hamilton sent a memo to Carey seeking approval of a $75,000 contribution to Project Vote. *Id.* ¶ 74. On or about October 17, 1996, Carey's executive secretary telephoned Carey and Carey approved the request. Shortly thereafter, Hamilton caused the IBT to donate $75,000 to Project Vote. *Id.* ¶¶ 75–76. On or about October 23, 1996, Hamilton sent a second memo to Carey asking for another contribution of $100,000 for Project Vote. Carey's executive secretary contacted Carey by telephone and Carey approved the $100,000 check request for Project Vote. The IBT then donated $100,000 to Project Vote. *Id.* ¶¶ 77–79.

In or about October 1996, Martin Davis asked Nash to ask Hamilton to recommend an IBT contribution to the National Council of Senior Citizens ("NCSC"), an organization that promoted the interests of senior citizens. *Id.* ¶ 80. On or about October 16, 1996, Hamilton sent Carey a memo recommending that the IBT contribute $85,000 to NCSC. Carey spoke with his secretary about the contribution on the telephone and approved the request. The IBT then contributed $85,000 to NCSC. *Id.* ¶¶ 81–83. NCSC then sent one half of the $85,000 amount to the

November Group, a political consulting firm owned by Martin Davis. *Id.* ¶ 84.

Under the IBT election rules, employers were not eligible to contribute or solicit funds for any IBT candidate. *Id.* ¶ 85. Defendant Barbara Arnold, Michael Ansara's wife, violated the election rules by donating money to the Carey re-election campaign. *Id.* ¶ 86. Barbara Arnold was a director of Defendant the Share Group, a telemarketing firm that employed hundreds of people. *Id.* ¶ 87. Her contribution was solicited by Michael Ansara, also an employer. *Id.* In connection with Arnold's contribution, Martin Davis and Ansara agreed to obtain funds from the IBT to reimburse Arnold. At the same at time, Charny advised Ansara that Arnold's contribution was acceptable. *Id.* ¶ 88.

On or about October 31, 1996, Ansara arranged for Arnold to contribute $45,000 to the TCFU. *Id.* 89. Subsequently, Ansara arranged for Arnold to contribute an additional $50,000 to the TCFU. *Id.* ¶ 91. In order to reimburse Arnold for the contribution, Martin Davis and Ansara caused Share Group to submit a padded invoice to the IBT for a telephone "get out the vote" campaign. Arnold was reimbursed through the excess funds paid by the IBT for the inflated bill. *Id.* ¶ 94. In addition, Martin Davis and Ansara agreed that Share Consulting would submit a fraudulent invoice for $75,000 to Citizen Action for consulting work that had never been performed. *Id.* ¶ 95. Citizen Action paid the bill, which was used to reimburse Arnold for her contribution to Carey's re-election campaign. *Id.* ¶ 96.

In addition to the foregoing schemes, in or about October 1996, Martin Davis sought to obtain an additional $100,000 from the IBT to pay a Carey re-election campaign debt owed to the November Group. *Id.* ¶ 98. Martin Davis first attempted to have the November Group debt paid by causing IBT to make another contribution to Citizen Action, which would then have paid the November Group. Martin Davis informed Defendant Ira Arlook, Executive Director of Citizen Action, that he would raise funds from the IBT for Citizen Action if Citizen Action would use $100,000 of those funds to pay the November Group. Arlook then sent a memo to Hamilton requesting a $150,000 contribution from the IBT. *Id.* ¶¶ 98–99. Hamilton, however, believed that an additional contribution to Citizen Action could not be justified. *Id.* ¶ 100.

Hamilton and Martin Davis then agreed to disguise the Citizen Action contribution by arranging with an AFL–CIO official to have the IBT contribute $150,000 to the AFL–CIO, which would then contribute $150,000 to Citizen Action. At Martin Davis' request, Nash asked Hamilton to recommend a $150,000 contribution from the IBT to the AFL–CIO. *Id.* ¶¶ 101–102. On or about October 31, 1996, Hamilton sent Carey a memo recommending that the IBT contribute $150,000 to the AFL–CIO. Shortly thereafter, Carey spoke with his executive secretary by telephone and approved the AFL–CIO contribution. *Id.* ¶¶ 104–105. In or about November 1996, the IBT contributed $150,000 in IBT funds to the AFL–CIO; the AFL–CIO then sent $150,000 to Citizen Action, which then sent $100,000 to the November Group, benefiting Defendants. *Id.* ¶ 106.

In or about the fall of 1996, Nash, Martin Davis and others devised a scheme to bill the IBT for expenses related to Carey's and other Defendants' efforts to protect and promote their positions and relationships with the IBT. *Id.* ¶ 107. Nash and Martin Davis caused November Group to send false invoices for approximately $21,000 to IBT for expenses allegedly incurred in connection with the July 1996 IBT convention. *Id.* ¶ 108. The $21,000

bill was first sent to Carey's re-election campaign, but Nash, Martin Davis and others decided to re-bill the IBT for the expenses. *Id.*

In 1997, the Election Officer began investigating whether contributions to TCFU had violated the election rules. *Id.* ¶ 109. On or about February 10, 1997, the Election Officer interviewed Blitz by telephone. During the telephone conversation, Blitz concealed material facts from and made materially false statements to the Election Officer concerning: the plan to solicit contributions from wealthy individuals in exchange for contributions in a larger amount from the IBT to organizations chosen by the contributor; Ansara's role in the fundraising for Carey; Ansara's instruction to Blitz not to discuss any contributions to benefit Carey; and the plan to have Ansara retain possession of the donor's checks until the IBT contributions were verified. *Id.* ¶¶ 114–115.

On or about April 29, 1997, representatives of the Election Officer interviewed Defendant Hamilton. Hamilton repeatedly made false statements regarding the IBT's contributions to Citizen Action, Project Vote, and the NCSC. Hamilton also concealed material facts from the Election Officer regarding the IBT's contributions to outside organizations and his relationships with other Defendants. *Id.* ¶ 127.

On or about July 1997, October 28, 1997 and November 10, 1997, representatives of the Election Officer interviewed Defendant Carey regarding contributions to Citizen Action, Project Vote, the AFL–CIO and other organizations. Carey repeatedly made false statements and concealed material facts from the Election Officer regarding his knowledge of these contributions and their circumstances. *Id.* ¶ 128.

Plaintiffs allege in the Amended Complaint that the goals and purposes of Defendants' enterprise, and the objects of their criminal venture, included: the enrichment of Defendants through embezzlement and mail and wire fraud; the protection and promotion of Defendants' positions and relationships with the IBT; and the deprivation of the IBT and its members of money, their right to the honest services of their officers and employees, and their right to the honest conduct of the 1996 election and future elections. *Id.* ¶ 135. The Amended Complaint alleges that the fraudulent enrichment and subject relationships "would have continued indefinitely if undetected." *Id.* The Amended Complaint further alleges that, "[b]ecause of defendants' positions and relationships with the IBT, their actions posed a threat of continued criminal activity." *Id.* ¶ 142.

## DISCUSSION

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir. 1998) (internal quotations omitted). Accordingly, in deciding a Rule 12(b)(6) motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *Harris v. City of New York,* 186 F.3d at 247. However, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck &*

*Co.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

*Plaintiff's RICO Claims*

■ As this Court explained in *Int'l Bhd. of Teamsters v. Carey,* 163 F.Supp.2d 271, 279 (S.D.N.Y.2001) (*"IBT I"*), Section 1962 of Title 18 of the United States Code prohibits: (a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or whose activities affect interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern of racketeering activity;" (c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity;" and (d) conspiring to do any of the above. 18 U.S.C.A. § 1962 (West 2001). A showing of the existence of a "pattern of racketeering activity" is therefore a fundamental element of any civil RICO action.

"Racketeering activity," as defined in 18 U.S.C. § 1961(1), encompasses acts chargeable under certain state criminal laws, acts indictable under numerous specific federal criminal provisions, including mail and wire fraud, and any "offense" involving bankruptcy or securities fraud or drug-related activities that is "punishable" under federal law. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 481–82, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The state law offenses include murder, kidnaping, gambling, arson, robbery, bribery, extortion, and drug offenses. The federal law offenses include bribery, counterfeiting, theft, embezzlement, extortion, and obstruction of criminal investigations and enforcement. *See* 18 U.S.C.A. § 1961 (West 2001 & Supp.2003); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. at 482, n. 3, 105 S.Ct. 3275.

Plaintiff asserts two causes of action under RICO, pursuant to 18 U.S.C.

§§ 1962(c) and (d), against each of the Defendants. To state a civil RICO claim under section 1962(c), the plaintiff must allege injury resulting from "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275; *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir.1994). The cause of action under section 1962(d) requires a showing of a conspiracy to violate one or more of the substantive RICO provisions. *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.,* 187 F.3d 229, 244 (2d Cir.1999).

In *IBT I,* the Court dismissed Plaintiff's original complaint, principally for failure to allege continuity of the alleged RICO enterprise sufficiently to state a cause of action under section 1962(c). The chief relevant difference between the original complaint and the Amended Complaint is the Amended Complaint's replacement of continuity and purpose allegations focused on the 1996–1997 election-related activities with broader allegations focused on an alleged intent of the defendants to perpetuate lucrative relationships with IBT, and the addition of allegations that the wrongful activities and objectives would have continued indefinitely. *See, e.g.,* Amended Comp. ¶¶ 26 (purposes of alleged enterprise included "enriching defendants through embezzlement and ... fraud that would have continued indefinitely if undetected" and "protecting and promoting defendants' positions and relationships with the IBT that would have continued indefinitely if undetected") and 75 (Defendant Carey approved allegedly fraudulent contribution to "assist him and his co-defendants to protect and promote their positions and relationships with the IBT"). The Amended Complaint also groups the allegations concerning channels and methods of illegal campaign contributions and the subsequent coverup of those contribu-

tions, characterizing them as separate schemes. *See id.* ¶¶ 3, 47–128. The Amended Complaint's specific factual allegations of illicit activity remain confined to the 1996 campaign and 1997 coverup activities relating to contributions and expense billing in connection with that campaign.

Despite its references to open-ended continuity and the addition of the broad continuity and motive allegations just described, the Amended Complaint, like its predecessor, fails—even when construed in the light most favorable to IBT—to allege facts sufficient to meet the continuity element of its RICO causes of action. IBT's federal claims will therefore be dismissed for failure to state a claim upon which relief can be granted.

*Pattern of Racketeering Activity*

 As the Court explained in *IBT I*, proof of a "pattern of racketeering activity" for purposes of RICO requires a showing of "at least two acts of racketeering activity" committed in a 10–year period. 18 U.S.C.A. § 1961(5); *De Falco v. Bernas*, 244 F.3d 286, 320 (2d Cir.2001); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d at 242; *Azrielli v. Cohen Law Offices*, 21 F.3d at 520. In order to establish such a pattern, the plaintiff must demonstrate that the predicate acts of racketeering activity by a defendant are "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Cofacredit*, 187 F.3d at 242. To satisfy the "continued

criminal activity" element of the cause of action, a showing of either "closed-ended continuity" or "open-ended continuity" will suffice. *See H.J. Inc.*, 492 U.S. at 239, 241, 109 S.Ct. 2893.

There is no dispute as to the sufficiency of the factual allegations of the Amended Complaint to demonstrate the requisite relationship among the predicate acts. Defendants argue, however, that the Amended Complaint fails to set forth facts sufficient to support the existence of a pattern of racketeering, specifically, that the Amended Complaint is insufficient to demonstrate "open-ended" continuity of the alleged racketeering activities.[3]

*Open-ended Continuity*

The Supreme Court has characterized open-ended continuity as a reference to "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Telephone Company*, 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The *H.J. Inc.* Court reviewed a number of examples of conduct indicative of such a threat, including a protection racket—a predicate offense that involves "a distinct threat of long-term racketeering activity, either implicit or explicit."[4] *Id.* at 242, 109 S.Ct. 2893. The Second Circuit has observed that courts applying section 1962(c) to open-ended activity "generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity" where "the acts of the defendant or the enterprise were inherent-

---

**3.** In *IBT I*, the Court found the original Complaint insufficient to support closed-ended continuity or open-ended continuity. Plaintiff has not renewed its argument of a pattern based on closed-ended continuity in connection with the Amended Complaint.

**4.** "Suppose a hoodlum were to sell 'insurance' to a neighborhood's storekeepers to cover them against breakage of their win-

dows, telling his victims he would be reappearing each month to collect the 'premium' that would continue their 'coverage.' " In such a case, "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

ly unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement." *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir. 1995).

The requisite threat can, alternatively, be "established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893. "The [open-ended] continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243, 109 S.Ct. 2893.

Plaintiff's factual allegations, as expanded in the Amended Complaint, meet neither of these tests. Although, as that complaint points out, several of the defendants have been convicted of predicate acts of racketeering and/or have agreed to cooperate in the investigation or prosecution of the alleged racketeering activity, the complaint nonetheless fails to allege facts showing that the scheme is "inherently unlawful" in the *Aulicino* sense. It is of course a truism that criminal conduct is inherently unlawful. As *Aulicino* and the Supreme Court's illustrations in *H.J. Inc.* make clear, however, simple unlawfulness of past activity is not sufficient to embody the requisite specific threat of future criminal activity. Rather, such acts must (like protection or shakedown schemes) threaten repetition by their nature, or (like killings to maintain discipline in a narcotics operation or bribery and money laundering

on behalf of organized crime) have been undertaken in pursuit of some ongoing illegal goal. *See Aulicino,* 44 F.3d at 1111–12; *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893.

 Here, the unlawful activity, all of which is alleged to have occurred in the context of Carey's re-election campaign, is alleged to have been undertaken for purposes of self enrichment, protection of ongoing relationships with Plaintiff, and depriving IBT and its members of money, the honest services of its officers and employees and the right to have elections conducted fairly. Most of these goals— while likely unwelcome to the object of Defendants' alleged attentions—are not themselves unlawful. Furthermore, fraud (the object of which is by definition to obtain money or property from others) has been held not to be "inherently unlawful" in the RICO continuity context. *See FD Property Holding, Inc. v. U.S. Traffic Corp.,* 206 F.Supp.2d 362, 370 (E.D.N.Y. 2002). Accordingly, the Court looks for other indicia of the requisite threat of further criminal activity.

 The Amended Complaint alleges no facts from which it could be inferred that Defendants' activities were a regular way of conducting their, or IBT's, ongoing legitimate business. Plaintiff argues that its allegations are, however, sufficient to show the existence of an association-in-fact criminal enterprise among defendants whose regular way of doing business "was to engage in criminal activity." Plaintiff's Mem. In Opp. at 18. Plaintiff also argues that the long-term relationship among Defendants Carey, Martin Davis and the November Group, dating back to 1991, and between Carey and Cohen Weiss, dating back to 1967, supports a finding of a threat of continuity because the November Group and Cohen Weiss benefitted financially from their association with Carey and the

IBT. Plaintiff's Mem. In Opp. at 19. Thus, Plaintiff contends, Carey and the other Defendants' long-term association supports the inference that their illegal conduct would have continued unabated had Carey remained in office. *Id.* at 18–19.

Even assuming for purposes of this analysis that Plaintiff's allegations are sufficient to define an association-in-fact-enterprise, Plaintiff's factual allegations are inadequate to support an inference that the enterprise was an ongoing one that would, absent discovery of the election-related fraud, have continued to engage in criminal activity as a regular way of doing business. Plaintiff alleges that, "[t]hroughout 1996 and 1997, defendants ... constituted an association-in-fact enterprise that conducted its affairs through a pattern of racketeering activity that, if undetected, would have continued indefinitely." Amended Complaint ¶ 132. The 1996 and 1997 activities described in the complaint were all election-related and were undertaken, Plaintiff alleges, in the context of a "critical need to raise additional money for Carey because the [election] race with Hoffa was extremely close, and the Hoffa campaign was raising substantially more money than the Carey campaign." Plaintiff further alleges that "Defendants were aware that if Carey lost the election, defendants would lose their positions and relationships with the IBT." *Id.* ¶ 48; *see also id.* ¶ 50 (need for several hundred thousand dollars to pay for direct mail campaign to coincide with mailing of ballots). These factual allegations, as distinguished from Plaintiff's conclusory recitation of RICO-related legal propositions, cannot support a reasonable inference that the enterprise would have continued after the election or that it posed a specific threat of future criminal activity. Plaintiff's additional allegations regarding the various Defendants' long-term, lucrative prior relationships with the IBT, and re-

garding the maintenance of those relationships as a motivation for engaging in the alleged election-related schemes, simply do not indicate an ongoing threat of criminal activity, particularly in the absence of any allegations of non-election-related illicit activity by these persons.

Furthermore, in that the coverup activity described in the Amended Complaint was directed at concealing past activity in connection with the 1996 election campaign, that activity is not inherently indicative of a threat that the underlying alleged illegal activity (illegal campaign contributions, mail and wire fraud facilitating those contributions and illegal campaign expense payments) was part of a larger generalized continuing pattern of fraudulent activity. Plaintiffs' factual allegations thus cannot reasonably be construed to suggest that such activity would have continued past the conclusion of the particular election-related efforts. *See Cofacredit,* 187 F.3d at 244 ("an 'inherently terminable' scheme does not imply the threat of continued racketeering activity") (citation omitted).

At most, the facts alleged in the Amended Complaint might suggest the risk of a *recurrence* of the criminal activity in connection with a future election, particularly if the confluence of political and economic factors identified in the Amended Complaint were to recur. The mere risk that there could be a recurrence under certain limited circumstances, however, does not constitute the sort of "specific threat of repetition extending indefinitely into the future" that is required to support a finding of a pattern of racketeering activity under Section 1962(c). *Cf. Pyramid Securities Limited v. IB Resolution, Inc.,* 924 F.2d 1114, 1119 (D.C.Cir.1991) (Supreme Court's illustrations in *H.J. Inc.* "indicate a requirement of far more than a hypothetical possibility of further predicate acts").

Plaintiff relies on a number of decisions whose underlying facts are sufficiently different from the circumstances at hand that they fail to provide support for the proposition that the Amended Complaint states a viable section 1962(c) claim. Plaintiff cites *United States v. Busacca*, 936 F.2d 232 (6th Cir.1991), *cert. denied*, 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991), in which, as this Court explained in *IBT I*, the U.S. Court of Appeals for the Sixth Circuit held that the defendant's embezzlement of union funds for the purpose of funding his defense of a criminal action established a threat of continued criminal activity. Busacca, who was at the time the president of an IBT local, had used his authority over union employee benefit plan fund assets to pay his own criminal defense costs from those assets without approval of the Fund's trustees, in connection with charges of embezzlement from the union and from those very plans. The embezzlement ceased only upon Busacca's conviction on the underlying charges and consequent removal from his position with the employee benefit plan. In light of these facts, the court in *Busacca* found that, as of the time during which the predicate acts were occurring, the "manner in which the embezzlements occurred was capable of repetition indefinitely into the future, as long as there were either legal fees or other expenses which Busacca wanted paid." *United States v. Busacca*, 936 F.2d at 238.

Unlike *Busacca*, where an initial round of embezzlement predated the predicate acts and the scheme in question was terminated by the fortuitous interruption of the racketeering activity by the conviction of the defendant, the embezzlement scheme alleged by the IBT began and terminated with the 1996 re-election campaign. The instant case thus does not present "a specific threat of repetition extending indefinitely into the future." *See H.J. Inc.* at 242, 109 S.Ct. 2893.[5] Rather, the allegations in the complaint, if proved, would establish that Defendants "engaged in a serious, but discrete and relatively short-lived scheme" to solicit illegal campaign contributions by promising IBT funds to donors. *See Cofacredit*, at 244. To the extent Plaintiff reads *Busacca* as supporting the proposition that the mere demonstrated ability to engage in criminal activity for one purpose suffices to support a finding of inherently unlawful activity threatening future repetition, the Court respectfully takes a different view.

This case is also quite different from *United States v. Aulicino*, 44 F.3d 1102 (2d Cir.1995), which involved a kidnaping ring whose methods were inherently criminal and which had an unexhausted list of targets. Other cases relied upon by the IBT involved facts clearly demonstrating that the criminal activity was at the core of the enterprise or that the defendant was involved with corruption broader than the particular predicate activity. In *Nafta v. Feniks International House of Trade*, 932 F.Supp. 422, 427 (E.D.N.Y.1996), the court found open-ended continuity where defendants had engaged in massive financial fraud that was outside "the genre of an 'ordinary commercial case'" against an unsophisticated Eastern European business. After the fraudulent scheme was uncovered, the defendants continued to engage

---

**5.** *Cf. United States v. Simmons*, 923 F.2d 934, 951 (2d Cir.), *cert. denied* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991) (open-ended continuity was found where three murders were intended to maintain discipline within a drug running enterprise); *United*

*States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir.), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (a defendant's actions involving bribery and money laundering for organized crime established open-ended continuity).

718

in conduct that perpetuated the fraud, including physically threatening the plaintiff in an attempt to intimidate the plaintiff into concealing the fraud. In *United States v. Kaplan*, 886 F.2d 536 (2d Cir. 1989), the Second Circuit determined that there was a sufficient threat of continuing racketeering activity where the court found that the defendant had demonstrated a "willingness to facilitate corruption generally in the [Parking Violations Bureau]" to which defendant had contracted to provide certain services. *Id.* at 543.

In *Teamsters Local 372 v. Detroit Newspapers*, 956 F.Supp. 753 (E.D.Mich. 1997), also cited by Plaintiffs in support of their argument, the court determined that predicate acts consisting of some forty-four instances of robbery, arson, destruction of property and assault occurring in the context of a strike constituted a threat of continuity. The court in *Detroit Newspapers* cited *Busacca* to the effect that threats of violence during a four day strike period "were deemed sufficient to allege a pattern of racketeering activity since the threats could be found to be the means of conducting the strike which in turn could have continued for an indefinite period of time." *Teamsters Local 372 v. Detroit Newspapers*, 956 F.Supp. at 766. (quoting *Busacca*, 936 F.2d at 238.) In *Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir.1995), the Ninth Circuit, also citing *Busacca*, determined that open-ended continuity existed with respect to a scheme in which several corporate officers of a recycling company and their families "solicited kickbacks, received and distributed illicit gratuities and commissions, secretly invested the proceeds in businesses that compete with [the recycling company for which they worked], and created false receipts overcharging ... for the transportation of goods and services." *Id.* at 1526. The court held that the defendants' "willingness to participate in the kickback

scheme and their affirmative misrepresentations regarding transportation costs demonstrate that if they had not been fortuitously interrupted by termination, the predicate acts could have recurred indefinitely." *Id.* at 1530.

The set of schemes here described by Plaintiff was, by contrast, inherently terminable. Once the election occurred, the schemes, and their alleged sponsoring enterprise, necessarily came to an end. None of the facts alleged by Plaintiffs indicates the adoption of fraud or embezzlement as a general means of doing business by the IBT itself or any other identifiable ongoing enterprise.

For these reasons the Amended Complaint, like its predecessor, fails to allege facts sufficient to support an inference of the existence of a pattern of racketeering activity and therefore fails to state a claim upon which relief can be granted under section 1962(c) of the RICO statute with respect to the Defendants. This is so even when the facts alleged in the Amended Complaint are, as is proper, read in the light most favorable to Plaintiff. Plaintiff's section 1962(c) claim will therefore be dismissed. Because Plaintiff has failed for a second time to identify and allege facts sufficient to satisfy the continuity element of the pattern requirement of section 1962(c) and has proffered no new facts in its opposition to the motion that would be material to a determination of this issue, the Amended Complaint will be dismissed with prejudice.

*Section 1962(d)*

Defendants also move to dismiss Plaintiff's section 1962(d) claim on the ground that Plaintiff has (i) failed to state a claim under section 1962(c), and (ii) failed to plead facts showing the existence of a RICO conspiracy. Section 1962(d) prohibits any person from conspiring to violate

any of the substantive provisions of Section 1962(a)-(c). To state a claim thereunder, a plaintiff must allege that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise," *Colony at Holbrook, Inc. v. Strata, G.C., Inc.*, 928 F.Supp. 1224, 1238 (E.D.N.Y.1996).

Because, as explained in *IBT I*, there can be no RICO conspiracy without a substantive RICO violation,[6] Plaintiff's section 1962(d) claim must be dismissed in light of the insufficiency of Plaintiff's 1962(c) claim.

*Common Law Fraud Claims*

The Amended Complaint asserts common law fraud claims against all of the Defendants and common law breach of fiduciary duty claims against Defendants Carey and Hamilton. The Court declines to exercise its supplemental jurisdiction over these claims. Therefore, they are dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, the motions of Defendants Ron Carey, William Hamilton, Ira Arlook, Charles Blitz and Rochelle Davis to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure are granted. Plaintiff's federal causes of action are dismissed with prejudice, and Plaintiff's state common law causes of action are dismissed without prejudice. The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

---

**6.** *See Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 353 (S.D.N.Y.1998).